**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_________________

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | No. CR-21-00772-SMB-1 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | October 27, 2021 |
| **Rahim Shabazz Harris,** | ) | |
| | ) | |
| Defendant. | ) | |
| _____________________________ | ) | |

**BEFORE: THE HONORABLE DEBORAH M. FINE, MAGISTRATE JUDGE**

**TRANSCRIPT OF PROCEEDINGS**

**DETENTION HEARING**

**APPEARANCES:**
For the Government:
U.S. ATTORNEY'S OFFICE
By: **Mr. Brian E. Kasprzyk**
2 Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004

For the Defendant:
FEDERAL PUBLIC DEFENDER'S OFFICE
By: **Ms. Debbie Jang**
850 West Adams Street, Suite 201
Phoenix, Arizona 85007

Transcriptionist:
Christine M. Coaly
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

**P R O C E E D I N G S**

THE COURT: Good afternoon, everyone. Please be seated.

COURTROOM DEPUTY: This is CR-21-772, the United States of America versus Rahim Shabazz Harris. This is the time set for a detention hearing.

MR. KASPRZYK: Good afternoon, Your Honor. Brian Kasprzyk for the United States.

THE COURT: Good afternoon, Mr. Kasprzyk.

MS. JANG: Good afternoon, Your Honor. Debbie Jang for Mr. Rahim Shabazz Harris, who appears by video with his consent.

THE COURT: Good afternoon to you and Mr. Harris.

And, Mr. Harris, do you agree to appear by video teleconference for the detention hearing because of the pandemic?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Thank you.

I find it's in the interest of justice to proceed in this matter and for the safety of the participants.

I've received and reviewed the Pretrial Services addendum.

The government may proceed.

MR. KASPRZYK: Thank you, Your Honor. With the Court's permission, we'd like to proceed by proffer and

argument.

THE COURT: Yes.

MR. KASPRZYK: And, Your Honor, the United States's position with respect to detention is relatively simple and straightforward.

Our concern is that Mr. Harris is a flight risk, because, as you can see from both his Pretrial Services report and the addendum, he is in an unstable situation, generally, and we would argue, not necessarily as a result of his substance abuse issues, to the extent that he has them.

And so our concern, ultimately, with the greatest respect to the work that is done at Crossroads, and for the great understanding that substance abuse can be a difficult thing, and we may not -- we may only see the tip of the iceberg as it pertains to Mr. Harris, the facts that we have before us, we believe that the problems for Mr. Harris that we think make him a flight risk have more to do with other factors other than his substance abuse.

And given how -- or how the -- the -- I'm sorry, Your Honor. What's the word I'm looking for? Given how valuable bed space at Crossroads is, and they're going to address substance abuse concerns, the United States's concern is, given all these other factors with Mr. Harris, that we would, perhaps, be using the wrong tool for the job.

And when I say that, Your Honor, I'm pointing,

particularly as annotated in the bail report and the addendum, the fact that Mr. Harris is currently homeless. He's unemployed. There is also a history, although it's admittedly an unresolved one, in Document 9, the original bail report, of a failure to appear from 2019. I don't know the results or anymore about that. It does raise concerns, and, again, goes to the government's theory that Mr. Harris is, quite frankly, in an unstable situation.

There are some comments in the reports from Pretrial Services about mental health concerns. And, again, we would view these much like his self-reported information about substance abuse, concerning, but ultimately when we were to look at all these factors, our fear is that he is a flight risk when the Court applies the 3142(g) factors.

We'd note that the nature and circumstance of this offense, there is five counts of straw purchasing, false statements during the purchase of a firearm.

With respect to the weight of the evidence, I would suggest to the Court that it's strong. The government's theory of the case is that the false statement in each of the counts was the address that he used, when, in fact, it wasn't his bona fide address, which at some level goes to the very heart of our concerns with Mr. Harris to begin with.

I've already talked at length about the history and circumstances of this particular defendant, so I won't belabor

that point.

With respect to the severity of punishment, it's the statutory maximum of five years on each count. The United States also recognizes that, regardless of how the case were to resolve, it is not likely that Mr. Harris would be facing the statutory maximum given his current record.

All this to say, Your Honor, is we still believe that, while he has screened for Crossroads, and while substance abuse is always a concern, his overall instability, we believe, is the greater concern, and that's why we believe detention is appropriate.

THE COURT: Thank you.

Ms. Jang.

MS. JANG: Thank you, Your Honor. We would also like to proceed with proffer and argument.

THE COURT: Yes.

MS. JANG: Your Honor, as -- as the Pretrial Services report addendum states, we would recommend -- we would request that Mr. Harris be released to the residential treatment facility at Crossroads. We believe that would address the concerns that Pretrial Services and the government has about Mr. Harris's substance abuse issues, lack of stable housing, and -- and general, I guess, instability, as the government states.

Following the -- I -- I understand that Crossroads

does not allow for defendants to be released pre -- preadmission into Crossroads, but to the extent that that is possible, we would also request that.

We believe that Mr. Harris should be released with conditions to reside with his girlfriend and to --

THE COURT: So you're asking that he be released before going to Crossroads?

MS. JANG: Your Honor, I -- this is my argument for after Crossroads, Your Honor. I -- I apologize, I did not --

THE COURT: No, but I -- I think you said should -- if it's possible to release him to Crossroads. Are you saying that you want him released and then waiting for his bed space date out of custody, or are you saying this is afterwards?

MS. JANG: Your Honor, if he is -- the bed space that's available is on December 1st, which is over a month away. So if it is possible, we would request that he be released during that time for the follow -- the following reasons.

But also I would -- this also goes into following Crossroads what -- so that he would be released from detention following Crossroads as well at a halfway house.

THE COURT: Okay. Well, I'm to impose least restrictive conditions. So if I decide Crossroads is least restrictive conditions, I'm not releasing him anywhere else first, notwithstanding any policy that Crossroads has.

I know Crossroads has a policy that they're not to be released, but it -- it also separately makes sense from the Bail Reform Act, because if I find that Crossroads is least restrictive conditions, then there wouldn't be lesser restrictive conditions that would be sufficient.

Likewise, if there were, I wouldn't be sending him to Crossroads because --

MS. JANG: I understand.

THE COURT: Okay.

MS. JANG: Excuse me. I'm sorry.

THE COURT: So that's -- that's just a nonstarter right now.

MS. JANG: I understand.

THE COURT: You can ask for him to be released to his girlfriend, but right now we have to get to the -- to where -- where you would like him released on conditions and why.

And I do have concerns. When I read the report, I did think to myself, well, I don't know what he told Crossroads, but I know he told the pretrial officer about a substance abuse problem that -- that, really, there is a problem, but it's not that big of a problem. I -- I agree with Mr. Kasprzyk that I have concerns that it's not the driving problem for his instability. While I hadn't used those words in my head, I had this overall sense of are we sending him to Crossroads because he's got a serious substance abuse problem, or are we sending

him to Crossroads if I send him and he has some substance abuse problem. And I have some -- I have some hesitation about that.

As I look through the Pretrial Services report, I can't really find something that would account, perhaps it's the mental health issues, but -- and -- and it could just be how he likes to live, it could be his personality, but he does have tremendous instability. His instability is outsized to the substance abuse problem that he described to Pretrial Services. And that's what I'm really interested in.

I don't think that releasing him back in the community -- but I'm happy to hear -- to hear what you have to say about that -- looks like it's sufficient given the history that's in the -- in the Pretrial Services report.

So those are my thoughts and I hope that that helps.

MS. JANG: Yes, Your Honor. And thank you. And I apologize if I was confusing or if I was misleading.

Your Honor, I guess the -- as it relates to Mr. Harris's conditions, we do believe that he is not -- he may have said things to Pretrial Services that may not have reflected the accurate -- his accurate living conditions. I spoke to both Mr. -- both Mr. Harris and his girlfriend, Antoniqua Simmons (phonetic), who is seated behind me --

THE COURT: Thank you for coming, ma'am.

MS. SIMMONS: You're welcome.

MS. JANG: And as -- and they have -- they both have

stated that he has all of his belongings and his -- and his pets are at her place. That is his place of living. They had just moved a month ago, which is why he may not have known the address.

And she is also currently pregnant with Mr. Harris's child, and -- and he did not want to put additional stress by telling Pretrial Services the address -- the accurate address of -- or that he was living with his girlfriend at the time, which I understand may not be the best of -- it may not be an excuse, but it is -- he was trying to do -- trying to minimize contacts for Ms. Simmons with the best of intentions.

And I know that he is also currently unemployed, but he has been applying for jobs on Indeed. And he had a job interview on Friday that he had to miss because of -- because he was in custody. So he has been trying to be -- find more stability in his -- both of his living situation, employment, and so that -- that is to address the -- the comments about instability, Your Honor.

THE COURT: Thank you.

Is there anything further, proffer, argument?

MS. JANG: No. Your Honor, I -- Mr. Harris would be willing to comply with any other conditions. It looks like Pretrial Services has listed 11 conditions of release that -- that would be least restrictive for his -- if -- if possible, if he is not accepted into Crossroads.

Thank you, Your Honor.

THE COURT: Thank you.

Mr. Kasprzyk.

MR. KASPRZYK: Your Honor, if the Court would allow the government to just address briefly the arguments with respect to Mr. Harris going to live with Ms. Simmons.

As I had shared with defense counsel just prior to the hearing, at the time that ATF had first attempted to interdict the firearms that are the subject in counts 1 through 5, they had occasion to speak with Mr. Harris and Ms. Simmons. And, during that time, there were two things that were shared with ATF that I believe is concerning and goes to the point as to instability.

What I would like to make crystal clear for the record is the United States is not commenting on the nature of the relationship between Mr. Harris or -- or Ms. Simmons. This is not a commentary in that in any way.

The statements made to the ATF was that -- that theirs was an on-again and off-again relationship, wherein when their relationship -- when they were together, Mr. Harris would stay with them -- stay with Ms. Simmons for a period of time. And that when they had -- at the time of the interdiction, they had just gotten back and he still was only spending the beginning portion of their reunification, only a few nights at a time with her.

Again, that's not a comment on their relationship, what I think it is, though, Your Honor, is further evidence that even releasing him to Ms. Simmons, recognizing that they're expecting a child, our concern, again, is instability.

The second fact that was shared by both Mr. Harris and Ms. Simmons at that time was that when asked about some of the firearms that Mr. Harris had purchased before, he'd indicated that he didn't have them, and he opined that, perhaps, they had been taken during a burglary after a domestic violence incident that he and Ms. Simmons had had in, I believe it was October of 2019.

Again, this isn't commentary on that. I'm not arguing that to the Court to suggest anything other than I believe this is further evidence of instability. And I think all of the arguments I made prior with respect to Crossroads would apply equally, the government's position, at least, as to being released to Ms. Simmons. Again, with the greatest of respect.

THE COURT: What were the circumstances of the --

THE DEFENDANT: I'm sorry. I don't know what that is.

THE COURT: It's -- you don't need to be sorry at all. I'm sorry. I don't know what that is.

Is that coming through the system or is that --

COURTROOM DEPUTY: Your Honor, it's coming from another room nearby, and I will notify systems.

THE COURT: Okay. Okay.

MR. KASPRZYK: I'm sorry, Your Honor. I didn't hear the Court's last question.

THE COURT: Thank you. It's just been -- we've been having audio problems all day.

Do you know the circumstances of the arrest?

MR. KASPRZYK: Which arrest, Your Honor?

THE COURT: Of Mr. Harris for the federal charges.

MR. KASPRZYK: For the federal charges currently?

THE COURT: Yeah.

MR. KASPRZYK: No, Your Honor. I do not.

THE COURT: Okay. Thank you.

MR. KASPRZYK: Ma'am.

THE COURT: Thank you.

This is not a presumption case and -- and so this is in the broad array of cases with the standard Bail Reform Act analysis. So at all times the defendant's entitled to the presumption of innocence, and nothing that I say is intended to affect that or should be interpreted that way. The Bail Reform Act is the law that I have to follow in evaluating whether, notwithstanding the presumption of innocence, the defendant should be released or detained pending further proceedings.

Because of the nature of this offense, the Court considers flight risk. So if the government shows by a preponderance of the evidence, more likely than not, that the defendant's a flight risk, then the Court must address whether

there are conditions I can set that can -- that will reasonably assure the defendant's appearance at further court proceedings. And if there are such conditions, then the Court is to impose the least restrictive of those conditions.

In determining this, the Court's required to consider the factors set forth under the Bail Reform Act, including the nature and circumstances of the alleged offenses, the weight of the evidence against the defendant, the nature and seriousness of the danger to others or the community.

Now, for the weight of the evidence, you know, the defendant's indicted, and -- and it's -- without hearing actual evidence or much more detailed proffer, I'm not saying that there -- the weight of the evidence isn't great, but I can't find, for these purposes, that the weight of the evidence that's been presented is great. And, nevertheless, in the Ninth Circuit, it's the least important factor.

The driving factor in these flight determinations usually is the history and characteristics of the defendant, the defendant's physical and mental condition, family ties, employment, length of residence in the community, community ties, past conduct, criminal record, history of drug and alcohol abuse, record of appearance at prior court proceedings, and whether the defendant was on conditional release of some sort at the time of the new alleged offense.

The role of the Pretrial Services report is to provide

the Court information about the defendant's characteristics as described under the Bail Reform Act. As part of that, the Pretrial Services office makes an assessment, in their view, of flight, and then here often danger as well, even though there is not a possibility of detention based on danger, and a recommendation. Those assessments and recommendations are just suggestions to the Court. I consider them but I do not have to follow them. I'm not bound by them.

Here the defendant was screened for possible placement at Crossroads on the suggestion of Pretrial Services, and Crossroads found the defendant suitable for placement. Bed space is available on December 1st, 2021. And Pretrial Services assesses that there are conditions that would reasonably assure the defendant's appearance. They include being at a halfway house or inpatient treatment facility such as Crossroads, and other conditions as set forth in the addendum as the least restrictive conditions.

And I've considered the arguments by the parties and the proffers and the record in the matter. Here the defendant is young. He's 25 years old and he has no steady employment. He has no steady home. His -- he was born and raised in Chicago, Illinois. He was there until he was 17, relocated to Arizona with his paternal grandmother for a, as he described it, a new start. And he's been, in his own description, that he's been residing from house to house in the past two years,

and described friends that let him nap at their residence and the like, even when not allowed to stay over night. And he noted that if released from custody, he would go to his girlfriend's residence.

And he doesn't have any children. He doesn't own any property. He does not have a regular residence. He does not have assets. He receives public support.

Regarding his health, on page 3 of the Pretrial Services report, there are concerns that I have regarding his mental health. And even though he is not currently treated and he appears to be competent for these proceedings. And I know Ms. Jang would have said something if -- if he's -- was not.

And so he disclosed some substance use history, but, you know, he described his alcohol consumption as occasional, and -- and his marijuana use as every other day, and certainly that's problematic. And the amount of alcohol, a cup-and-a-half of vodka in one sitting when he's consuming alcohol is concerning. And he's had Xanax on an occasional basis.

But as I expressed earlier, I -- this -- this substance abuse problem that he's described to Pretrial Services is -- does not appear to be the driving factor in why he has not established, at 25 years old, any stability in his residence or employment, despite that he has family that has cared for him.

And he's fathered three children from separate relationships, and he provides financial support when he has the financial means. But, again, there -- these children do not seem to tie him to any particular community or home or occupation and they are not in his care.

To his credit, he has a limited arrest and criminal history. But it's concerning to the Court that he does have a failure to appear out of -- it appears to be, it says Phoenix, California, but I think it's meant to be Phoenix, Arizona, because it's Scottsdale city court. He's got a failure to appear from August 15th, 2019, on traffic matters, including no valid driver's license, failing to provide evidence of insurance, and failing to have registration. It concerns me that if he's not going to show up for something that's less serious, he's got more incentive to avoid something that's more serious.

And -- and he has an arrest that's more recent regarding narcotic drugs, paraphernalia, possession and use of a weapon. And so I -- I would say, to his credit, other than the failure to appear, he really doesn't have criminal history. I don't weight the arrest, with no complaint filed, very heavily. So, admittedly, this -- part of this is a close call.

There is no question that by a preponderance of the evidence the government has shown that the defendant is a flight risk. Where it's a close call is whether starting

placement at Crossroads would reasonably assure the defendant's appearance. And given his social history, his lack of ties to the district, his lack of ties to really anything in particular, to a home, to a job, to, you know -- I'm not just saying romantic relationships, I'm just saying, generally, you know, his personal relationships. And it's very concerning that he wouldn't be forthright with Pretrial Services.

And so I find that, given his -- given these circumstances, there are not conditions that I could set that would reasonably assure the defendant's appearance at further court proceedings. And I have considered very seriously Crossroads, but it's not a locked facility. It involves a dedication to be there. There is a lot of work to be done. Sticking with it is a requirement of being able to stay at Crossroads, and he hasn't shown that he sticks with anything. And his substance abuse problem that's reported, I don't think, accounts for this issue.

So I find after weighing the Bail Reform Act factors -- I find after -- I find after weighing the Bail Reform Act factors, that there are not conditions I could set that would reasonably assure the defendant's appearance at further court proceedings, and he'll be detained pending further proceedings.

Is there anything further from the government?

MR. KASPRZYK: No, Your Honor. Thank you.

THE COURT: From the defense?

MS. JANG: No, Your Honor. Thank you.

THE COURT: Thank you, everyone. We're adjourned.

Sir, you can get up and knock on the door behind you. Thank you.

(The proceedings were adjourned.)

* * *

C E R T I F I C A T E

I, CHRISTINE M. COALY, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

DATED at Phoenix, Arizona, this 29th day of October, 2021.

/s/ Christine M. Coaly
Christine M. Coaly, RMR, CRR